UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BRIAN HESTER,

      Plaintiff,

v.                               Case No. 06-13552

CITY OF FLINT, WILLIAM AYRE,           HONORABLE AVERN COHN
and JESSE BUCHANAN,

      Defendants.

_____/

**MEMORANDUM AND ORDER**
**GRANTING CITY OF FLINT'S MOTION FOR SUMMARY JUDGMENT**
**AND**
**GRANTING WILLIAM AYRE AND JESSE BUCHANAN'S MOTION FOR SUMMARY**
**JUDGMENT**
**AND**
**DISMISSING CASE**

I.  Introduction

This is an employment case.  Plaintiff Brian Hester (Hester) is suing his former

employer, the City of Flint, and former supervisors, William Ayre (Ayre) and Jesse

Buchanan (Buchanan) claiming that he was terminated in violation of the

Whistleblower's Protection Act, M.C.L. § 15.362, the Elliot Larsen Civil Rights Act,

M.C.L. § 37.2202 (age), and 42 U.S.C. § 1983 (First Amendment).

Before the Court is the City of Flint's motion for summary judgment and Ayre and

Buchanan's motion for summary judgment.[1]  For the reasons that follow, the City of

_____

[1]The City of Flint is represented by the City of Flint Department of Law.  Ayre and
Buchanan are separately represented by the same outside counsel.

Flint's motion will be granted and Ayre and Buchanan's motion will be granted. The case will be dismissed.

## II. Background

The material facts as gleaned from the parties' papers follow.[2]

Hester worked for the City of Flint for twenty-three (23) years prior to his discharge on June 30, 2006. At the time of his discharge, Hester was a crane/shovel operator for the City of Flint's demolition division, a position he held since 2003. Hester worked with two other individuals in the demolition division,. Bruce Geary (Geary) and Jeff Shurter (Shurter). Hester and Geary held the same position; Shurter was the foreperson. Essentially, the demolition division was responsible for boarding up and demolishing buildings. The job involved, among other things, Hester operating an excavator. At the time of Hester's discharge, Ayre was Director of Transportation for the City of Flint. Buchanan was the City's Chief Development Officer. Buchanan reported to Ayre, and Ayre reported directly to the City's Mayor, Donald Williamson.

Hester apparently worked without incident until late 2004. In August of 2004, a private demolition company called Rock Solid, who was personally hired by the Mayor (Williamson), assisted in performing demolition work for the City of Flint. Hester first became aware of Rock Solid in August of 2004 while working on a project at a water

---

[2]Neither the City of Flint nor Ayre and Buchanan complied with the Court's motion practice guidelines for summary judgment by submitting a statement of material facts not in dispute. Hester filed a counter-statement of disputed facts, to which the City of Flint and Ayre and Buchanan responded in their reply briefs. Neither Hester's filing or defendants' filings contain a statement in the form required by the Court. Be that as it may, the Court compiled the background facts as best as could be discerned from the papers before it.

plant.  While on his way to the job site, Buchanan called Hester and told him to give his

keys to the City-owned excavator to an individual from Rock Solid.  Hester refused to

turn over the keys and instead contacted the president of the local union who eventually

arrived at the site.  A compromise was reached where Hester continued at the work site

and loaded the fill-dirt into Rock Solid's dump trucks.

Shortly after this incident, on August 23, 2004, Hester appeared at the Mayor's

office during public office hours.  Hester testified at deposition that he wanted to speak

with the Mayor because:

> I went to see him because I wanted to know why there was an illegal
> demolition crew out doing my job while I was being sent off to do beautification
> projects for the mayor.
> . . .
> [I wanted] to ask for more help because there was only two employees.
> And I went to ask him–there was people's names on the list ready to be sent over
> to our department.

Hester dep. at p.43-44.

Hester also received information from Geary that he had spoken with someone

from Rock Solid and Geary believed that Rock Solid was not properly licenced.  Hester,

however, testified at deposition that he did not inform any officials to this effect, other

than his comment to the Mayor that it was an "illegal" crew.  Eventually, Rock Solid was

discontinued as a contractor for the City of Flint.

Hester went to see the Mayor a second time during his public office hours about

a month later.  It is not clear from the record what the substance of Hester's meeting

was beyond that it was a "follow-up" to his prior meeting.

Hester says that when Ayre and Buchanan learned that Hester went to see the

Mayor, they were upset with him; both testified at deposition that they viewed Hester's

actions as going behind their backs.  He was orally reprimanded not to go outside the chain of command or at least should inform his supervisors before going to see the Mayor.

Hester says that after meeting with the Mayor he was subjected to "an inordinate abount of unjustified discipline."  However, at deposition he testified that he received two oral reprimands, noted above, regarding him going outside the chain of command.  He also said he received a written reprimand for not reporting an accident; but admitted that all the other employees involved received the same discipline.  He also testified he might have been disciplined for making a copy of key to a City vehicle without prior approval, but could not recall if it was reduced to writing.  Hester further testified that none of these incidents resulted in him being demoted or otherwise altered the terms of his employment.

Hester's next contact with defendants was in January 2005 while working at a subdivision development known as University Park Estates.  The owner of University Park Estates asked Ayre if the City of Flint would remove the fill-dirt that had accumulated from the building of homes.  Ayre agreed to removed the dirt that the City of Flint could use to back-fill already demolished lots.  Hester's job on the project was to load fill-dirt into dump trucks to use throughout the City.  Prior to agreeing to remove the dirt, Ayre testified at deposition that the owner provided the City with documentation, which is not in the record, that the soil was not contaminated.

Hester, however, testified at deposition that he knew from prior foreperson that the site used to be a dumping ground and believed that the soil was contaminated with unsafe levels of arsenic and xylene.  Hester refused to move the dirt and told Buchanan

of his belief.  Buchanan told him the dirt was safe and directed Hester to move the dirt.

Geary, Hester's co-worker, was also on the site.  Geary testified at deposition that Hester was holding in his hand a document indicating the dirt was safe and that Hester, at first, did not want Geary to see it.  The document is not in the record.   Hester stated in an affidavit that he never saw such a document.  However, at deposition he testified that someone gave him a piece of paper at the site and told him that it said the soil was okay to move.  Hester testified that he looked at it but did not understand it.

Hester says he called Jim Innis with the Department of Environmental Quality (DEQ) from the site who told him to only move the soil to another place on the site.  However, neither Ayre nor Buchanan recalled hearing from the DEQ.  Buchanan continued to direct Hester to move the soil; Hester eventually complied.

After the dirt was moved, Ayre contacted Rick Freeman of Rowe Engineering to have the soil tested for the contaminants Hester indicated.  In April 2005, Freeman released a report showing that the soil was safe.  The Introduction of the report states that "[p]revious studies completed at the University Park site identified elevated concentrations of arsenic and xylene in the soil at the site."  However, the Results portion states:

> All detections of arsenic in the eighteen composited soil samples collected form the eighteen lots at the University Park site were below the MDEQ SDBL for arsenic.  Only two of the soil samples collected from the eighteen lots identified xylenes above the method detection limit, however, the concentration was below the MDEQ GSIP and RDW levels.  Based on these results, the soil from the eighteen lots . . . may be used as clean fill at sites located beyond the University Park property.

Approximately two months later, on March 29, 2005, Buchanan received a complaint from a citizen about an incident on January 29, 2005 in which she witnessed

Hester remove three radiators from the University Park site and load them in a non-city vehicle. Buchanan notified Ayre, who told him to put the incident in writing. No action was taken against Hester at this time.

About two months later, on May 27, 2005 Hester began an extended sick leave, lasting almost a year. Although not entirely clear from the record, it appears that the leave was stress-related.

While on sick leave, Hester made a complaint with Michigan Occupation Safety and Health Administration (MIOSHA) dated January 7, 2006. The complaint indicated that Hester was concerned he had been exposed to contaminated soil at the University Park site and was worried about his health. No action was taken on the complaint. As indicated above, the April 2005 report showed the soil was safe. However, Ayre and Buchanan testified at deposition that they were aware of the MIOSHA complaint and dismissed it as "fraudulent."

Hester returned to work on June 3, 2006. Hester says that upon his return, Ayre told him that the demolition crew was "one big happy family now." Ayre also told Hester he heard a rumor that Hester was considering retirement. Buchanan testified at deposition that he hoped Hester would retire because he was difficult to work with.

Upon his return, on June 15, 2006, Hester attended an asbestos training seminar[3] in Kalamazoo, Michigan along with Geary and the following other City employees: Richard Thibault, Aaron Ambrose, Todd Furze, and William Chrenko. Also

_____

[3]The state of Michigan requires municipalities who perform demolitions to send its employees to asbestos training courses to obtain certifications. Hester was required to attend because his certification had lapsed.

in attendance were individuals from private companies and other municipalities.  The instructor was Dr. A. Clark Kahn, who contracts with businesses and municipalities to provide such training.  During a break, Hester made a comment to Kahn in front of others in the class regarding demolishing buildings.  Hester describes the comment in his deposition as follows:

> . . . because there was a lot of conversations that went on in that class, and I'm the type of person that my hand went up quite a bit during the course of the day.  And on that particular discussion, the teacher was talking about imminent danger, collapse in emergency houses and so on and so on.  He's talking about it.
> I raise my hand.  I asked him – I say "Well, there was an instance that happened a couple years ago in which a supervisor"  – when we went to his office, e pick up a camera to go take pictures of the house.  When we went to the office, me and Bruce Geary, the foreman handed the camera to Bruse.  And he looked and he kind of went "I want you to knock a hole in the side of the house, then take your picture."

Hester dep. at p. 114-115.  Hester further explained that it was Buchanan who had made the statement about knocking a hole in a building, taking a picture of it, and then declaring that the building was an emergency demolition.

A few days after the meeting, Geary and Kevin Muma, Geary's foreperson, went to Buchanan's office and told him about Hester's comment at the training.  Apparently, Geary was concerned that Dr. Kahn or others present at the training would interpret Hester's statement as indicating the City engaged in illegal demolitions. Buchanan told Ayre.  Ayre was upset and directed Buchanan to ask the City employees who were present at the training to give a written statement about what they heard Hester say and to contact Dr. Kahn to find out what happened.  The statements from Hester's coworkers are in the record.  They all confirm that Hester essentially said that the City will punch a hole in a building and take a picture in order to have it declared an

7

emergency in need of demolition.  Some employees stated that they did not know whether Hester was serious or joking; however they all expressed concern with the potential negative impact his statement would have on the City.

On June 19, 2006, Hester was told to meet with Buchanan.  Buchanan informed Hester that he was suspended pending further investigation for "making false accusations against the demolition division."

At some point thereafter, Hester appeared for a <u>Loudermill</u>[4] hearing in Ayre's office.  Hester's statement to Dr. Kahn was discussed.  Hester was terminated, effective June 30, 2006.  The termination notice states that termination was for "intentionally but untruthfully at a recent asbestos training workshop accused the city of fraudulent activities in order to have structures be declared an emergency demolition."  Ayre signed the discharge; Buchanan notarized it.

B.

On August 8, 2006, Hester sued the City of Flint, Ayre and Buchanan in federal court.  The complaint makes the following claims:

I.      § 1983 - First Amendment Claim against Ayre
II.     § 1983 - First Amendment Claim against Buchanan
III.    Age Discrimination against Ayre under Elliot Larsen
IV.     Age Discrimination against Buchanan under Elliot Larsen
V.      Age Discrimination against the City of Flint under Elliot Larsen
VI.     Whistleblower's Protection Act against the City of Flint

Following extended discovery, defendants then filed the instant motions for summary judgment.

---

[4]<u>Cleveland Bd. of Ed. v. Loudermill</u>, 470 U.S. 532 (1985)

III. Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50. Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52). The Court "must view the evidence in the light

most favorable to the non-moving party." <u>Employers Ins. of Wausau v. Petroleum Specialties, Inc.</u>, 69 F.3d 98, 101 (6th Cir. 1995). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. <u>See</u> <u>Anderson</u>, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. <u>Thompson v. Ashe</u>, 250 F.3d 399, 405 (6th Cir. 2001).

IV.  The City of Flint's Motion

As noted above, Hester has asserted age discrimination and whistleblower's protection act claims against the City. Each claim is addressed in turn.

A.  Age Discrimination

1.

Michigan's Elliot Larsen Civil Rights Act (ELCRA) prohibits an employer from discharging an employee because of or age. <u>See</u> M.C.L. § 37.2202(1)(a). Claims under the Elliot-Larsen Act are generally subject to the same evidentiary burdens as claims for employment discrimination under the Age Discrimination in Employment Act. <u>McDonald v. Union Camp Corp.</u>, 898 F.2d 1155, 1159 (6th Cir.1990).

Here, because Hester does not identify any direct evidence of discrimination, he must make out an age discrimination claim based on disparate treatment. Under the guidelines established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973) as adopted in Michigan, Hester must show that he was (1) a member of a protected class (between 40 and 70), (2) subject to an adverse employment action, (3) qualified for the position from which he was rejected or terminated, and (4) either replaced by a person from outside the protected class, or treated differently than a similarly situated

10

employee from outside the protected class under circumstances that give rise to an inference of unlawful discrimination. See Lytle v. Malady, 458 Mich. 153, 172-73 (1998). If he establishes a prima facie case, the burden of persuasion shifts to the City to present a legitimate non-discriminatory reason for the challenged employment decision. Should the City carry this burden of persuasion, then the burden returns to Hester to prove by a preponderance of the evidence "sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer" toward him. Lytle, 458 Mich. at 176.[5]

2.

The City argues that Hester fails to make out a prima facie case of age discrimination because he was not replaced by a person outside the protected class. The City says that when Hester went on extended sick leave, he was provisionally replaced by Richard Thibault, who was 53 years old at the time. Hester, however, says that he was replaced by Geary, who is outside the protected class.

The Court agrees with the City. Hester's relies on Geary's deposition testimony where he explained he was "unsure" of the precise date when he began working in the same job classification (Crane-Shovel-Operator) as Hester, stating he believed it was approximately the end of 2005 or the beginning of 2006. However, the roster cards submitted by the City of Flint confirm that Geary began work as a Crane-Shovel-

---

[5]Michigan law differs from federal law on the issue of pretext. Under federal law, pretext is established where a plaintiff shows the proffered reason is unworthy of belief. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147-48 (2000). Michigan, on the other hand, follows the "pretext plus" requirement which requires a showing that the proffered reason was pretextual and that discrimination was a motivating factor in the decision.

Operator on March 13, 2005 when Hester was already in the position.  Thibault, on the

other hand, began work in July of 2005 while Hester was on sick leave.  Geary's

statement is insufficient to create a genuine issue of material fact as to whether Hester

was replaced by someone outside the protected class.  Thus, Hester has failed to

establish a prima facie case of age discrimination.  Thus, this claim fails.

B.  Whistleblower's Protection Act

1.

The Whistleblower's Protection Act (WPA), MCL 15.362, provides that an

employer may not discharge, threaten, or otherwise discriminate against an employee

because the employee reports or is about to report a violation or suspected violation of

a federal or state statute or regulation to a public body.  In order to prevail on a claim

under the WPA, Hester must demonstrate that "(1) he was engaged in protected activity

as defined by the act; (2) the defendant discharged him, and (3) a causal connection

exists between the protected activity and the discharge."  Chandler v. Dowell,

Schlumberger, Inc., 456 Mich. 395, 399 (1998).  "Protected activity" is defined as where

an employee:

> (1) reports a violation or suspected violation of a law or regulation to a public
> body, (2) is about to report such a violation to a public body, or (3) is asked by a
> public body to participate in an investigation.

Trepanier v. Nat'l Amusements, Inc., 250 Mich. App. 578, 583 (2002).  Importantly, "[t]o

have engaged in a protected activity under the Whistleblower's Protection Act, the

plaintiff reasonably must believe a violation of law, regulation, or rule has occurred."

Shimkus v. Hickner, 417 F. Supp. 2d 884, 907 (E.D. Mich. 2006) (citing Melchi v. Burns

Int'l Sec. Serv. Inc., 597 F. Supp. 575 (E.D. Mich. 1984).  Under the third element of the

whistleblower claim, the motivation of an employee reporting a suspected violation "must be a desire to inform the public on matters of public concern." <u>Shallal v. Catholic Soc. Servs. of Wayne County</u>, 455 Mich. 604, 621, 566 N.W.2d 571, 579 (1997). Otherwise, the plaintiff cannot "establish a causal connection between his actions and her firing." <u>Ibid</u>. The Michigan Supreme Court explained:

> Many courts have held that a plaintiff is precluded from recovering under a whistleblower statute when the employee acts in bad faith. See, e.g., <u>Melchi v. Burns Int'l Security Services, Inc.</u>, 597 F. Supp. 575 (E.D. Mich.1984), <u>Wolcott v. Champion Int'l Corp.</u>, 691 F. Supp. 1052 (W.D. Mich.1987). The primary motivation of an employee pursuing a whistleblower claim "must be a desire to inform the public on matters of public concern, and not personal vindictiveness." <u>Id</u>. at 1065.

<u>Id</u>. at 621-22.

When considering claims under the WPA, a court applies the burden-shifting analysis used in retaliatory discharge claims under the Civil Rights Act, M.C.L. § 37.2101 et seq. <u>Roulston v. Tendercare (Michigan), Inc.</u>, 239 Mich. App 270, 280-281; 608 N.W.2d 525 (2000). That is, if Hester successfully establishes a prima facie case under the WPA, the burden shifts to the City to articulate a legitimate business reason for the plaintiff's discharge. <u>Id</u>. at 281. If the City produces evidence establishing the existence of a legitimate reason for the discharge, Hester then has the opportunity to prove that the legitimate reason offered by the City was not the true reason, but was only a pretext. <u>Id</u>.

### 2.

The City first argues that Hester's complaints to the mayor regarding Rock Solid, being concerned about the soil at University Park Estates, and filing a MIOSHA complaint regarding his exposure to the soil, is not protected activity under the WPA

because it was not <u>subjectively reasonable</u> for Hester to believe that any violations of the law had occurred. Thus, Hester has not made out the first element of a prima facie case. Hester says that at a minimum, there is a genuine issue of material fact as to whether he acted in subjective good faith.

The Court is constrained to agree with Hester on this point. As to Rock Solid, apparently Hester's suspicions about the company's activities turned out to be true as it is undisputed that Rock Solid was removed as a contractor for the City and was not properly licensed because it did not have asbestos training certification. Hester's complaints regarding the University Park Estates are a little more fuzzy, as the record indicates Hester was told several times, and may even have had confirmation, that the soil was safe. However, the April 2005 report does state that previous studies showed high levels of contaminants in the soil. Hester also testified that he heard from previous foreperson about the contaminated nature of the site. The Court is simply not prepared to say on summary judgment that Hester's belief was not subjectively reasonable for that his complaints were made in bad faith. Thus, Hester has established the first element of a prima facie case of discrimination under the WPA.

3.

The City also argues that Hester claim fails because his complaints were not causally connected to his termination and has therefore failed to show the third prong of a prima facie case. To satisfy the causal connection requirement, the plaintiff must show that his or her participation in a protected activity was a "significant factor" in the employer's adverse employment actions, not merely a causal link between the two. <u>Barrett v. Kirtland Community College</u>, 245 Mich. App 306, 315; 628 N.W.2d 63 (2001).

The City of Flint says that the complaints occurred several months prior to Hester's termination and therefore cannot be said to be causally connected. Hester says there is a dispute issue of fact.

The causal connection element and pretext requirement often become merged, as the parties have done here in their arguments, inasmuch as they cite cases discussing the pretext requirement and the timing between the protected activity and adverse employment action. In order to survive summary judgment, Hester must "demonstrate that the evidence in the case ... is 'sufficient to permit a reasonable trier of fact to conclude that [plaintiff's protected activity] was a motivating factor in the adverse action taken by the employer....' " <u>Hazle v. Ford Motor Co.</u>, 464 Mich. 456, 465, 628 N.W.2d 515 (2001), quoting <u>Lytle v. Malady</u> (On Rehearing), 458 Mich. 153, 176, 579 N.W.2d 906 (1998). In other words, Hester must " 'raise a triable issue that the employer's proffered reason ... was a pretext for [retaliating against plaintiff's protected activity].' " <u>Hazle</u>, <u>supra</u> at 465-466, 628 N.W.2d 515, quoting <u>Lytle</u>, <u>supra</u> at 176, 579 N.W.2d 906. "A plaintiff can prove pretext either directly by persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Roulston</u>, <u>supra</u> at 281, 608 N.W.2d 525, citing <u>Hopkins v. Midland</u>, 158 Mich. App. 361, 380, 404 N.W.2d 744 (1987).

The parties agree that mere proximity in time is not sufficient to establish the causal connection or to show pretext. Indeed, there is no dispute that Hester's protected activity came several months prior to his termination. There are, however, certain facts which tend to weigh in Hester's favor. First, Hester was on sick leave for

nearly a year and was terminated within of month of his return.  Second, the record

shows that both Ayre and Buchanan were upset, legitimately or not, with Hester's

complaints.

However, and significantly, the record is abundantly clear that Hester was

terminated because of the statement he made at the asbestos training and not because

of any prior protected activity.[6]  As such, Hester has failed to make out a prima facie

case of discrimination under the WPA because he cannot show a causal connection

between his protected activity and his termination.  Ayre and Buchanan both testified

_____

[6]At oral argument, the parties informed the Court that Hester had grieved his
termination and were awaiting a final decision from an arbitrator.  The Court adjourned
the hearing to allow the parties to supplement the record with the arbitrator's decision
once it issued.  The arbitrator issued a decision on May 21, 2008, finding just cause for
Hester's termination.  Thereafter, the parties filed supplemental papers as to the effect
of the arbitrator's decision.
        The weight to be given the arbitrator's decision is governed by the Court of
Appeals for the Sixth Circuit's decision in <u>Nance v. Goodyear Tire & Rubber Co.</u>, __
F.3d __, 2008 WL 2151626 (6th Cir. May 23, 2008).  In <u>Nance</u>, the court of appeals
made clear that an arbitrator's decision has no estoppel effect on the employee bringing
statutory claims against their employer. <u>Id</u>. at 5.  However, the court of appeals further
explained that the arbitrator's decision may have some evidentiary value, explaining:
        . . . Indeed, a district court may admit an arbitrator's decision as evidence
        based on "the degree of procedural fairness in the arbitral forum, adequacy of the
        record with respect to the issue of discrimination, and the special competence of
        particular arbitrators," or when "the issue is solely one of fact, specifically
        addressed by the parties and decided by the arbitrator on the basis of an
        adequate record." <u>Id</u>. at 60 n. 21.
Here, it is apparent from the arbitrator's decision that the arbitral process allowed for
documentary evidence to be submitted from both sides, and the arbitrator heard
testimony from several individuals involved, including Hester, Hester's supervisors, and
coworkers.  The decision, however, focused on the sole issue of whether Hester was
terminated with just cause and did not address any allegations of discrimination.  The
decision has value to the extent that it details the circumstances of Hester's termination
regarding his statements at the asbestos training conference and supports the Court's
conclusion that Hester was terminated because of his statement, not because of any
prior protected activity.

that Hester's statement, if reported, could have threatened to shut down the demolition department and was therefore very serious and warranted termination. There is no doubt that Hester's statement had the potential to threaten the ongoing operations and funding of the City of Flint's demolition department. According to Buchanan, Dr. Kahn told him in a phone conversation that Hester said it was "the practice" of the City of Flint to engage in this activity. Dr. Kahn testified slightly different at deposition, indicating he heard similar type of comments frequently, had no intention of reporting the City, and could not tell if Hester was serious or seeking clarification. All of Hester's coworkers who were present at the training gave consistent statements as to what Hester said and expressed concerns about Hester's statement being taken by other attendees as to how the City of Flint conducted its demolitions. The record is sufficiently clear as to the reason for Hester's termination to conclude that Hester's protected activity was not causally connected to or a motivating factor in his termination. Thus, Hester's claim of discrimination under the WPA fails for failure to make out a prima facie case.

V.  Ayre and Buchanan's Motion for Summary Judgment

Hester asserts age discrimination and § 1983 claims against these defendants. Each claim is separately addressed.

A.  Age Discrimination

Hester's age discrimination claim against Ayre and Buchanan fails for the same reason that his claim against the City of Flint fails–Hester has no evidence that he was replaced by a younger employee.

B.  First Amendment Retaliation under 42 U.S.C. § 1983

1.

Hester's claim that Ayre and Buchanan violated his constitutional rights are brought under 42 U.S.C. § 1983, under which Hester must prove (1) that there was a deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under of color of state law.  Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003).

Since Hester was a municipal employee, there would appear to be dispute over the second component.  However, Buchanan argues that he was not involved with Hester's termination and therefore cannot be liable under § 1983.  Hester argues that the record is sufficient to show that Buchanan was a decision-maker.

Buchanan cites no authority for the proposition that because he had "no input" into the decision to terminate Hester, he is not liable.  Hester cites one case, Shager v. Upjohn, Inc., 913 F.2d 398 (7th Cir. 1990).  The issue in Shager was whether a supervisor's hostility towards older workers could be imputed to the defendant who was the ultimate decision- maker in the plaintiff's termination.  Shager has been cited in the Sixth Circuit in cases addressing the issue of whether to input actions by a supervisor or manager to an ultimate decision-maker or the employer in determining whether the plaintiff was discriminated against.  The case does not discuss whether the supervisor or manager is himself individually liable as a decision-maker.  Nevertheless, the parties seem to agree that if the individual has significant input into the decision to terminate, he may be liable.  Under this assumption, the Court considers the record.

While Buchanan points to his deposition testimony and Ayre's deposition testimony where they both state that Ayre made the decision to terminate Hester, the record is not that clear.  Buchanan and Ayre were in close contact regarding Hester's

employment activities.  Ayre received information about Hester from Buchanan.  Ayre also testified that he would have discussed terminating Hester with Buchanan would have been part of discussion.  The Court is constrained to conclude that Buchanan may have had more input into the decision to terminate Hester.  At a minimum, there appears to be a factual dispute.  However, as explained below, summary judgment is appropriate on other grounds.  As such, the Court need not resolve the issue.

2.

Hester says that Ayre and Buchanan retaliated against him for exercising his First Amendment rights.  The Sixth Circuit recently described such a claim with respect to public employees, stating:

> This court has developed a three-step test for analyzing a public employee's claim of First Amendment retaliation.  First, [the plaintiff] must show that, as a matter of law, the speech at issue was protected.  See Taylor v. Keith, 338 F.3d 639, 643 (6th Cir. 2003).  To do so, he must demonstrate both that the speech "touches on a matter of public concern" and that "his interest in the speech outweighs the government's countervailing interest in promoting the efficiency of the public service it provides as an employer."  Id. [The plaintiff] must next show that his termination by [defendant] "would chill an ordinary person in the exercise of his First Amendment rights."  Id.  Finally, he "must present sufficient evidence to create a genuine issue as to whether his speech was a substantial or motivating factor in the employer's decision to discipline or dismiss."  Id.

Haynes v. City of Circleview, 474 F.3d 357, 362, 363 (6th Cir. 2007).

3.

Buchanan and Ayre argues that Hester's § 1983 claim against them fails because Hester's "speech" - his statement to Dr. Kahn is not protected because (1) it arises out of his job responsibilities and (2) does not address a matter of public concern. The Court agrees.

The first element, whether the plaintiff's speech was a constitutionally protected activity, is divided into two sub-elements. The first sub-element of the test-"whether the relevant speech addressed a matter of public concern," Rodgers, 344 F.3d at 596-seeks to draw a line between issues "relating to any matter of political, social, or other concern to the community," Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and those that largely reflect the "quintessential employee beef" about incompetent or insensitive management. Jackson v. Leighton, 168 F.3d 903, 911 (6th Cir.1999). The second sub-element invokes the balancing test set forth in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), calling upon the court to determine whether the employee's interest in speaking as he did outweighed the defendants' interests in keeping him silent. Bonnell v. Lorenzo, 241 F.3d 800, 809 (6th Cir. 2001) (citing Connick, 461 U.S. at 147-50, 103 S.Ct. 1684). The factors to be considered in weighing the parties' respective interests include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 483 U.S. 378, 388 (1987).

In Garcetti v. Ceballos, 547 U.S. 410, 421-22 (2006), the Supreme Court addressed the public concern requirement in relation to statements made by a public employee in the course of their job duties, stating that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the

exercise of employer control over what the employer itself has commissioned or created."

In <u>Garcetti</u>, the plaintiff was a deputy district attorney in the Los Angeles County District Attorney's Office.  He was a calendar deputy, which placed him in a supervisory capacity over other deputies.  A defense attorney informed plaintiff that there were inaccuracies in an affidavit used to obtain a critical search warrant in a case pending against the defense attorney's client.  Plaintiff conducted an investigation, determined that the affidavit indeed contained serious misrepresentations, and wrote a memo to his supervisor recommending dismissal of the case based on the defective affidavit.  After plaintiff's supervisors met to discuss the situation, his immediate supervisor continued to prosecute the case.  At a hearing on the defendant's motion to suppress, plaintiff was called by the defense to testify about his concerns regarding the affidavit.

Plaintiff claimed that, following these events, the District Attorney's Office retaliated against him for speaking out by reassigning him from a calendar-deputy position to a trial-deputy position, transferring him to another courthouse, and denying him a promotion.  After losing an internal employment grievance, plaintiff sued the District Attorney's Office on a theory of First Amendment retaliation under 42 U.S.C. § 1983.  The Supreme Court rejected his claim that his speech was protected by the First Amendment, holding that "[t]he controlling factor in [plaintiff's] case is that his expressions were made pursuant to his duties as a calendar deputy."  <u>Id</u>. at 1959-60. The Court noted further that "[t]he fact that his duties sometimes required him to speak or write does not mean that his supervisors were prohibited from evaluating his performance."  <u>Id</u>. at 1960.

The Sixth Circuit has addressed the holding in Garcetti in two recent cases. First, in Haynes v. City of Circleview, supra, the plaintiff was a canine handler and patrolman for the defendant city. Plaintiff wrote a memo to his chief complaining about a reduction in the availability of canine training. The Sixth Circuit held that plaintiff's speech was not protected as it related to his job responsibilities as a patrol officer and canine handler. The Court noted that plaintiff's complaints about the reduction in dog training, although obviously not part of his official written job description, occurred as part of "carrying out his professional responsibilities" of training dogs, and therefore were made "pursuant to his official duties." Id. at 364.

The Sixth Circuit again considered Garcetti in Weisbarth v. Geauga Park Dist., 499 F.3d 538 (6th Cir. 2007). The plaintiff sued under § 1983 suit against the defendant county park district, claiming First Amendment retaliation for her termination as park ranger and canine handler allegedly due to comments that she made to consultant hired by employer to interview employees as part of departmental evaluation. The comments were made during a ride-along with a consultant hired by defendant to evaluate morale problems in the department. Plaintiff discussed a disciplinary "letter of counseling" that she had recently received. She also discussed "morale and performance problems within the Ranger Department." Following the ride-along, plaintiff claimed she was retaliated against as a result of her comments. The Sixth Circuit held that her speech was not protected because it related to her job duties. Importantly, the Sixth Circuit pointed out that

> The reasoning of Garcetti and Haynes, however, makes clear that the determinative factor in those cases was not where the person to whom the employee communicated fit within the employer's chain of command, but rather

whether the employee communicated pursuant to his or her official duties. See, e.g., Garcetti, 126 S.Ct. at 1961 (stating broadly that "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities").

Id. at 545.

Hester says his speech is not within the holding of Garcetti or subsequent Sixth Circuit cases because he was reporting official misconduct and there is nothing in his job description requiring him to report misconduct. Hester cites several cases from other jurisdictions in support. Hester's comment to Dr. Kahn was made within the context of his job responsibilities and therefore not protected. As Ayre and Buchanan. cogently state:

> [Hester] was speaking to the individual who was conducting his asbestos recertification instruction. The certification was necessary for his job, and the issues raised concerned demolition work. Both the class itself and the topics covered directly related to [Hester's] job responsibilities. [Hester] was not speaking as a private citizen, but as a demolition worker for the City of Flint who was discussing issues concerning that role. [Hester's] speech therefore does not fall under the ambit of the First Amendment.

Ayre and Buchanan's brief at p. 12-13. As such, Hester's speech is not protected.

Moreover, even assuming Hester's comment was not within the holding in Garcetti, he also fails to arise to a First Amendment claim because it does not touch on a matter of public concern. Hester's comment about allegedly being told how to falsify emergency demolitions falls under "the quintessential employee beef: management has acted incompetently." Haynes, supra at 365. There is no evidence that Hester was trying to protect the public with his comment. "Regardless, of whether [Hester's] speech was made as a joke, for [Hester's] educational benefit, or in order to protect [Hester] from legal consequences in the future, the speech was unquestionably made for

[Hester's] own benefit." Ayre and Buchanan's brief at p. 13.

To the extent that Hester claims his comments to the mayor about Rock Solid and to MIOSHA form the basis for his §1983 claim, these comments also fail to rise to a viable claim. The comments were clearly made within the context of his job with the demolition department and were essentially "employee gripes," which are matters of private concern.

VI.  Conclusion

For the reasons stated above, Hester has failed to make out a prima facie case of age discrimination because there is no material evidence he was replaced by a younger employee. Hester has also failed to make out a prima facie case of discrimination under the WPA because there is no material evidence that his termination was causally connected to his prior protected activity. Hester has failed to establish a § 1983 claim because his speech arose out of his job responsibilities and does not address a matter of public concern.

Accordingly, the City of Flint's motion for summary judgment is GRANTED. Ayre and Buchanan's motion for summary judgment is GRANTED. This case is DISMISSED.

SO ORDERED.

Dated:  June 11, 2008                              s/Avern Cohn
                                                  AVERN COHN
                                                  UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, June 11, 2008, by electronic and/or ordinary mail.

 s/Julie Owens
Case Manager, (313) 234-5160